Filed 12/9/13  P. v. Caines CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057233 |
| v. | (Super.Ct.No. RIF1202963) |
| LUKE WAINE CAINES, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Reversed in part with directions; affirmed in part as modified.

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Luke Caines Jr., guilty of (1) four counts of kidnapping for purposes of robbery (Pen. Code, § 209, subd. (b)(1));[1] (2) six counts of robbery (§ 211); (3) and one count of dissuading a witness (§ 136.1, subd. (c)(1)). Defendant admitted suffering (1) a prior strike conviction (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)); (2) a prior serious felony conviction (§ 667, subd. (a)); and (3) three prior convictions that resulted in prison terms (§ 667.5, subd. (b)). The trial court sentenced defendant to prison for a determinate term of 19 years plus an indeterminate term of 14 years to life.

Defendant raises four issues on appeal. First, defendant contends substantial evidence does not support two of his robbery convictions (§ 211). Second, defendant contends his robbery sentences must be stayed pursuant to section 654 because the crimes involve the same intent as his convictions for kidnapping for purposes of robbery. The People concede defendant is partially correct, in that the sentences for the postkidnapping robberies should be stayed, but the sentences for the prekidnapping robberies should not be stayed.

Third, defendant asserts the trial court misunderstood it had the discretion to impose a concurrent, rather than a consecutive, sentence for the crime of dissuading a witness. The People agree with defendant's third contention. Fourth, defendant contends the trial court erred by imposing fees for all counts charged, even though defendant was found not guilty of some counts. The People agree with defendant's

---

[1] All subsequent statutory references will be to the Penal Code unless indicated.

fourth contention.[2]  We reverse defendant's sentence in Count 14, direct the trial court to resentence defendant for Count 14, and modify other aspects of defendant's sentence and fees, but otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.    PROSECUTION'S CASE

On March 8, 2012, at approximately 9:30 p.m., four college students, Andrew, Zachary, Justin, and Michelle[3] (collectively "the victims"), went to a Rite Aid drug store in Riverside to purchase alcohol for an upcoming fraternity event in Las Vegas. The victims went to the store in Andrew's car.  The victims went into the store together, but after approximately five minutes, Justin, Zachary, and Michelle returned to the car, while Andrew stayed inside the store to purchase the alcohol.  Justin was seated in the back passenger seat.  Michelle sat in the back driver's side seat.  Zachary sat in the front passenger's seat.

Shortly after the group entered the car, before the doors were locked, defendant opened the back passenger door, next to Justin.  Defendant pushed Justin into the middle of the backseat, entered the car, and said he had a gun.  Defendant said "he

---

[2]  In his opening brief, defendant raised a fifth issue.  Defendant asserted there is insufficient evidence that he can afford to pay a booking fee.  The People cited the recently decided case of *People v. McCullough* (2013) 56 Cal.4th 589 to support their position that defendant forfeited this contention by failing to raise it at the trial court.  In defendant's reply brief, he concedes the issue has been forfeited.  As a result, we do not review this issue.

[3]  We use the victims' first names because (1) we are presenting some of their banking information, and (2) only the first initials of their last names were used in the Amended Information.  No disrespect is intended.

3

needed $600 in order to get food for his kids for the night," and also to fix his car, which had "broken down." Within approximately one minute, Andrew returned to the car and sat in the driver's seat. When Andrew turned around, he saw defendant in the backseat. Defendant said, "I need $600 and I have a gun, so don't do anything dumb." The victims never saw a gun, but defendant held his hand in his sweatshirt pocket as though he had a gun.

The victims gave defendant the cash they had with them, "but it was not a lot." Defendant said the cash was insufficient and directed Andrew to drive to the Bank of America across the street so the victims could withdraw cash using their credit cards or ATM cards. Defendant threatened to "use the gun" if the victims did not comply. Andrew drove to the bank. Defendant instructed the victims to withdraw everything from their accounts. The victims made withdrawals from the drive-up ATM one at a time. Andrew withdrew $100 from his account. Justin withdrew $120, which was all the money he had. Zachary, who was in the passenger seat not near the ATM, had to give his card to Michelle so she could withdraw the money from his account. $80 was taken from Zachary's account, which overdrew his account. Michelle withdrew $40.

At the drive-up ATM, while Michelle and Justin were withdrawing money, Andrew "casually" leaned out of his open window and called 911. Andrew held the phone by his chin and whispered to the 911 operator that he was being robbed and his location. The phone was not next to Andrew's ear, so he could not hear the operator. Defendant asked Andrew who he was calling. Andrew said he was not on the telephone. Defendant asked if Andrew was "calling [Andrew's] dealer." Andrew

4

responded, "[Y]eah, I'm calling my dealer," because Andrew was afraid of being harmed for calling the police. Defendant told Andrew that he should not call the police. Andrew asked if defendant wanted him to close his window. Defendant responded, "[N]o, because I don't want to get any glass on your lap from the bullets."

While the victims were withdrawing money, police arrived at the bank. The officers drove past the victims and defendant. Zachary thought about trying to get the officers' attention, but felt he would be risking his life if he did so, so he did nothing. Video cameras at the bank captured the incident, including the police officers' arrival.

Defendant said he still needed $180. Andrew said he could withdraw more money at Citibank. Defendant agreed to go to Citibank. The police cars were in front of Andrew, so he attempted to make an illegal U-turn, in hopes of capturing the officers' attention. Defendant told Andrew "to straighten up because [Andrew was] hold[ing] a lot of people's lives in [his] hands." As a result, Andrew made a legal U-turn and went to Citibank.

Andrew withdrew $180 at Citibank. Video cameras recorded Andrew withdrawing money at Citibank. Defendant directed Andrew to drive to a fast food restaurant, but then directed Andrew to return to the Rite Aid. Defendant told Andrew to call Andrew's father and have him deposit $1,000 in each of the four victims' accounts. Defendant had taken Andrew's telephone, so Andrew dialed his mother's telephone number from Justin's telephone. Due to Justin's telephone being from a different area code, Andrew accidentally called "a completely random woman," rather than his mother. Because Andrew was taking too long, defendant took Justin's

5

telephone from Andrew. Defendant spoke to the woman on the telephone who then ended the call because "she had no idea what was going on."

At that point, defendant directed Zachary to dial a telephone number on Zachary's telephone. Defendant took the telephone and spoke to someone. Defendant asked the victims if they wanted to see his children. Andrew said he did not want to see defendant's children. Defendant asked Michelle if she wanted to go to a movie. Defendant gave approximately $100 to Michelle, which he said was "for the trouble [she had] been though." Defendant then "jumped out of the car" and said, "'You just got punked.'" Andrew "sped away as fast as [he] possibly could because [he] was afraid that [defendant] was going to take his gun out and shoot through [the] windows." Defendant was arrested on May 22, 2012.

## B.    DEFENSE'S CASE

Defendant testified in his own defense. The following is defendant's version of the events: Defendant was selling drugs at the Rite Aid on the night of March 8, 2012. Justin asked defendant if he had "any sprinkles," which refers to methamphetamine. Defendant confirmed he had methamphetamine and asked how much Justin wanted. Justin, Zachary, and Michelle entered the car; Justin called defendant over to the car. Justin opened the door and told defendant, "'Get in the car.'" Defendant entered the car. Defendant, Justin, and Zachary discussed how much methamphetamine they wanted to purchase and the price for the various amounts.

Zachary had $67. Defendant had $200 worth of methamphetamine on his person. The three students asked to sample the drugs, which defendant allowed.

6

Zachary and Justin consumed some of the methamphetamine. When Andrew entered the car, Zachary asked Andrew if he had any cash. Andrew gave Zachary $80, which Zachary gave to defendant for the drugs Zachary kept when he took some methamphetamine to sample.

The victims and defendant agreed that defendant would sell them one-half ounce of methamphetamine for $600. Andrew suggested going to Bank of America to get more money for the purchase. At one point, Andrew tried to call his drug dealer to get a lower price than that quoted by defendant. The victims could not get the entire $600 from Bank of America, so Andrew volunteered to go to Citibank to get the rest of the money. Andrew "darted out in[to] traffic," and defendant said, "'Hey, man. Be careful. You got four lives back here.'" Andrew withdrew more cash, and then the group returned to Rite Aid.

At Rite Aid, defendant was looking for a person who could give him more methamphetamine to sell to the victims. Andrew became upset saying, "'Dude, you're wasting our fucking time. We could have gotten it from my dealer earlier.'" Defendant used Zachary's telephone to call another person who sells methamphetamine, but the call was unsuccessful. Defendant returned the money to Justin and Michelle. Defendant exited the car and the victims drove away.

## DISCUSSION

### A.    SUBSTANTIAL EVIDENCE

Defendant contends substantial evidence does not support his convictions for Counts 6 and 10. Count 6 pertains to robbing Andrew at the Bank of America. Count

7

10 pertains to robbing Zachary at the Bank of America. Defendant asserts the two Bank of America robberies are indivisible from the robberies in the Rite Aid parking lot, therefore, there is not substantial evidence of separate robberies taking place at the Bank of America.

The *Bailey* doctrine was created in *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*). The case provides, "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan. [Citation.]" (*Id.* at p. 519.)

The People assert the *Bailey* doctrine was designed to address the difference between misdemeanors and felonies. For example, multiple petty thefts could be aggregated to a single charge of grand theft. The People contend that since "[t]here is no such thing as grand robbery," the *Bailey* doctrine is inapplicable in this case. We elect to decide the matter on the evidence of this case, rather than address the broader legal issue.

"As with all factual questions, on appeal we must review the record to determine whether there is substantial evidence to support a finding that the defendant harbored multiple objectives. [Citations.] The *Bailey* doctrine applies as a matter of law only in the absence of any evidence from which the jury could have reasonably inferred that the

8

defendant acted pursuant to more than one intention, one general impulse, or one plan. [Citation.]" (*People v. Jaska* (2011) 194 Cal.App.4th 971, 984.)

The jury could reasonably infer that in the Rite Aid parking lot, defendant's intent was to rob Andrew and Zachary of the cash they had on their persons. This inference is supported by defendant taking the s victims' cash. Defendant did not immediately announce his intent to go to the banks. For example, defendant did not enter the car and say, "Take me to the bank and withdraw all your money." After defendant took the victims' cash he decided he wanted more money. At that point, defendant formulated the intent to go to Bank of America and take money from the victims' accounts.

Since there is nothing indicating defendant intended to steal money from the victims' bank accounts when he entered the car, the jury could reasonably conclude defendant harbored two separate intents. Initially at the Rite Aid, defendant intended to take only the cash the victims had in their immediate possession. After the Rite Aid robbery was complete, defendant intended to take something else—the money from the victims' bank accounts. The jury could find the intents did not exist simultaneously. The jury could find the intents developed separate and apart from one another. Thus, there were two distinct intents, two distinct impulses, and two distinct plans. (See *Bailey*, *supra*, 55 Cal.2d at p. 519 ["one intention, one general impulse, and one plan"].)

Defendant asserts the evidence reflects a single intent of taking $600 from the victims. Defendant points to contradictory evidence of a single intent, but we must interpret the record in the light most favorable to the judgment. (*People v. Loza* (2012)

207 Cal.App.4th 332, 346-347.)  We agree the record could be read as reflecting a single intent to take $600 from the victims in any way possible, e.g., via cash, bank accounts, and credit cards.  However, the record can all also be interpreted as reflecting two separate plans or intents.  The first intent was to enter the car and take the money the victims had with them.  The second intent developed when defendant discovered the victims "didn't have a lot" of cash.  At that point a new intent and plan developed, which was to take any money defendant could obtain from the victims' bank and credit card accounts.  This second plan or intent is supported by the evidence that defendant was checking the victims' account balances and requiring the victims to overdraw their accounts, i.e., take more money than the victims actually had in their accounts.  Since we can reasonably read the record in a manner that supports the judgment, we find defendant's argument to be unpersuasive.

Defendant relies on the case of *People v. Irwin* (1991) 230 Cal.App.3d 180 (*Irwin*) to support his argument.  In *Irwin*, the victim was in her car in the drive-thru lane of a McDonald's restaurant.  The defendant approached, held a knife to the victim's chest, and ordered her to "'scoot over.'"  The defendant sat in the driver's seat, moved the car across the parking lot toward a store that was closed.  As the defendant drove, he demanded the victim's money and purse.  The victim gave the money and purse to the defendant.  As the defendant neared the closed store, he ordered the victim out of the car.  The victim exited the car and the defendant drove away.  (*Id.* at pp. 183-184.)

10

On appeal, the defendant asserted "the trial court should have dismissed the grand theft of an automobile count because it was a lesser and necessarily included offense of the robbery." (*Irwin*, *supra*, 230 Cal.App.3d at p. 184, fn. omitted.) The People argued the grand theft charge was not a lesser included offense of robbery. The appellate court reasoned, "Robbery is a crime which is frequently spread over distance and varying periods of time. It is generally committed in three phases, which are assault of the victim, seizure of the victim's property, and the robber's escape to a location of temporary safety. [Citation.] The crime of robbery is not confined to the taking of property from the victim, and the crime is not completed until the robber has won his way to a place of temporary safety. [Citation.] Thus, a robbery may be a continuing crime, spread over distance and time. [Citation.] That defendant here relieved the victim of her purse and money and then a short time later removed her car from her does not alter the continuing nature of the robbery." (*Id.* at p. 184.)

The appellate court wrote, "We find no authority for the proposition that a robber may be charged with and convicted of a separate robbery, or an additional offense of grand theft, because he or she took more than one item from a solitary victim during a single course of conduct." (*Irwin*, *supra*, 230 Cal.App.3d at p. 185.) The court continued, "[S]ince the defendant had neither ceased to threaten violence toward the victim nor had yet made his escape at the time he let the victim out of her car and drove away, there was but one act of robbery, and that occurred concurrently with the accompanying acts of theft (i.e., the taking of the victim's purse, money and car)." (*Id.* at p. 186.)

In evaluating the evidence, the appellate court cited the "small distance across the parking lot" that the defendant and the victim travelled and "the few seconds which elapsed between each taking." The court concluded the thefts were part of "a continuous transaction," and the automobile theft was "necessarily included" within the robbery. (*Irwin*, *supra*, 230 Cal.App.3d at p. 186.)

The evidence in this case is distinguishable from that in *Irwin*. In the instant case, defendant demanded the victims' money at the Rite Aid. When the amount proved insufficient, defendant moved to a new plan, intent, or impulse, which was to take anything he could get from the victims' bank and credit card accounts. In *Irwin*, everything was taken in the same parking lot within seconds. There is nothing indicating the *Irwin* defendant evaluated the amount of money and then asked for the purse, then evaluated the worth of the purse and asked for the car. Rather, the items in *Irwin* were taken as part of single scheme or plan. Since the evidence in the instant case supports a finding of two separate intents, we find *Irwin* distinguishable.

B.      SECTION 654

1.      *PROCEDURAL HISTORY*

Defendant was convicted of four counts of kidnapping for robbery (§ 209, subd. (b)(1)): Count 1 pertained to Andrew, Count 2 pertained to Zachary, Count 3 pertained to Justin, and Count 4 concerned Michelle. Defendant was convicted of six counts of robbery: Count 5 concerned taking Andrew's cash at Rite Aid; Count 6 concerned taking Andrew's money at Bank of America; Count 7 pertained to taking Andrew's cellular telephone at Bank of America; Count 9 concerned taking Zachary's cash at the

12

Rite Aid; Count 10 concerned taking Zachary's money at Bank of America; and Count 11 concerned taking Justin's money at Bank of America.

At the sentencing hearing, the trial court deemed Count 5 to be the principle count and imposed a six-year prison term for that Count. The sentences for Counts 6, 7, 9, 10, and 11 were ordered to be served concurrent to the sentence for Count 5. The trial court imposed a consecutive term of 14 years to life for Count 1 and concurrent terms of 14 years to life in Counts 2, 3, and 4.

### 2.    *DISCUSSION*

Defendant contends his six robbery sentences (Counts 5, 6, 7, 9, 10, and 11) should have been stayed pursuant to section 654 because a defendant may not be sentenced for both kidnapping for robbery (§ 209, subd. (b)(1)) and robbery (§ 211). The People concede defendant is partially correct. The People assert the Bank of America robbery sentences should be stayed because those robberies occurred after the kidnappings, but the Rite Aid robbery sentences should not be stayed because those robberies took place before defendant formed the intent to kidnap the victims.

"'Section 654 precludes multiple punishment for a single act or indivisible course of conduct punishable under more than one criminal statute. Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the "intent and objective" of the actor. [Citation.] If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each

13

other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.]' [Citation.]" (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240.)

As set forth *ante*, substantial evidence supports the finding that defendant had separate intents for the Rite Aid and Bank of America robberies. The same reasoning separates the Rite Aid robberies from the kidnappings for purposes of robbery. There is nothing indicating defendant intended to steal money from the victims' bank accounts when he entered the car; rather, he only intended to take the cash in their immediate possession. After the Rite Aid robbery was complete, defendant decided he wanted more money, and then formed the intent to take all the money in the victims' bank accounts. At that point, with that new intent formed, defendant kidnapped the victims and robbed them at Bank of America. Thus, the Rite Aid robberies are separate and distinct from the kidnappings and Bank of America robberies. However, the kidnappings and Bank of America robberies share the same intent—the intent to take all the money in the victims' bank accounts.

Since the kidnappings and Bank of America robberies share the same intent, we conclude the trial court erred by not staying defendant's robbery sentences in Counts 6, 7, 10, and 11. We will direct the trial court to stay defendant's sentences in Counts 6, 7, 10, and 11.

14

## C.      SENTENCING DISCRETION

### 1.      *PROCEDURAL HISTORY*

At the sentencing hearing, the trial court said, "With respect to Count 14, a violation of Penal Code Section 136.1(c)(1), the sentence is prescribed by law to be a mandatory consecutive sentence.  I'm sentencing the defendant to a term of midterm, three years in state prison, doubled to six years because of the strike, to run consecutive to Count 5."

### 2.      *ANALYSIS*

Defendant asserts the trial court was not aware it had the discretion to impose a concurrent, rather than a consecutive, sentence for the crime of dissuading a witness (§ 136.1, subd. (c)(1)) (Count 14).  The People agree with defendant's contention.

We apply the de novo standard of review when interpreting a statute.  (*People v. Whaley* (2008) 160 Cal.App.4th 779, 792.)  We first examine the statutory language, giving the words their usual and ordinary meanings.  If the wording is unambiguous, then we presume the Legislature meant what it wrote and the plain language of the statute governs.  (*Ibid.*)

Section 1170.15 provides, "Notwithstanding subdivision (a) of Section 1170.1 which provides for the imposition of a subordinate term for a consecutive offense of one-third of the middle term of imprisonment, if a person is convicted of a felony, and of an additional felony that is a violation of Section 136.1 or 137 and that was committed against the victim of, or a witness or potential witness with respect to, or a person who was about to give material information pertaining to, the first felony, or of a

15

felony violation of Section 653f that was committed to dissuade a witness or potential witness to the first felony, the subordinate term for each consecutive offense that is a felony described in this section *shall consist of the full middle term of imprisonment for the felony for which a consecutive term of imprisonment is imposed*, and shall include the full term prescribed for any enhancements imposed for being armed with or using a dangerous or deadly weapon or a firearm, or for inflicting great bodily injury." (Italics added.)

Under the foregoing italicized language, if the sentencing court chooses to impose a consecutive term for the dissuading a witness conviction, then that term must be the full term and not one-third of the full term as section 1170.1, subdivision (a), provides. However, section 1170.15 does not mandate that a term imposed for a dissuading a witness conviction must be a consecutive term. Therefore, the trial court's belief that 1170.15 required the court to impose a consecutive sentence is incorrect. The sentencing court retained discretion to impose either a concurrent or consecutive term, but if it chose a consecutive term, then it had to be the full term and not one-third. Therefore, the Count 14 sentence must be reversed and the trial court must determine whether to impose a concurrent or consecutive term for the dissuading a witness conviction. We express no opinion as to whether upon resentencing the term should be consecutive or concurrent.

### D. BOOKING FEE

Defendant contends the trial court erred by imposing security fees (Pen. Code, § 1465.8) and criminal conviction assessments (Gov. Code, § 70373) for all 14 counts

charged, even though defendant was found not guilty of three counts.**4**  The People agree with defendant's contention.

Penal Code section 1465.8, subdivision (a)(1), provides, "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense . . . ."  Government Code section 70373, subdivision (a)(1), provides, "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense . . . ."

By their plain language both statutes require fees to be applied based upon the number of a defendant's convictions.  The trial court ordered defendant to pay $560 pursuant to Penal Code section 1465.8.  The fee is $40 per conviction, which means the court imposed the fee for 14 convictions.  We will direct the trial court to change the Penal Code section 1465.8 fee to $440, for 11 convictions.  The trial court ordered defendant to pay $420 pursuant to Government Code section 70373.  The fee is $30 per felony conviction, which means the court imposed the fee for 14 convictions.  We will direct the trial court to change the fee amount to $330, for 11 convictions.

## DISPOSITION

Defendant's sentence for Count 14 (Penal Code, § 136.1, subd. (c)(1)) is reversed and the trial court is directed to resentence defendant for Count 14.  Defendant's sentences in Counts 6, 7, 10, and 11 are stayed pursuant to Penal Code section 654.

---

**4**  Defendant was found not guilty in Counts 8, 12, and 13.  Count 8 pertained to robbing Andrew at Citibank.  Count 12 concerned taking a "cash card" from Michelle. Count 13 pertained to robbing Michelle at Bank of America.

Defendant's Penal Code section 1465.8 fee is modified to the total amount of $440.

Defendant's Government Code section 70373 fee is modified to the total amount of $330. The trial court is directed to issue a minute order and an amended abstract of judgment reflecting (1) the sentence for Count 14 imposed at the resentencing hearing, and (2) the stayed sentences in Counts 6, 7, 10, and 11. The minute order should also reflect the fee modifications. The trial court is directed to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. (Pen. Code, §§ 1213, 1216.) In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

RICHLI
J.